## ATTACHMENT A-AFFIDAVIT

I, Christopher M. Cavanaugh, Special Agent, United States Department of Justice, Drug Enforcement Administration (DEA), being duly sworn, deposes and states the following:

## INTRODUCTION

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment C.

2.      Your Affiant is a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and has been so employed for approximately fourteen years.  Your Affiant is currently assigned to the Billings Resident Office of the DEA, Enforcement Group Federal Narcotics Task Force comprised of federal agents as well as state and local officers.  While with the DEA, your affiant has received specialized training concerning violations of the Controlled Substances Act, contained within Title 21 of the United States Code while attending the DEA Training Academy in Quantico, Virginia.  Your affiant has also received training in the methods of conducting federal T-III, complex conspiracy and financial investigations, club drugs, undercover investigations, basic telecommunication

1

exploitation and internet telecommunication exploitation.  During the course of your affiant's training and experience, your affiant has worked with experienced narcotics agents and officers and conducted numerous of arrests for state and federal drug violations.

3.      Your affiant is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that your affiant is empowered by law to conduct investigations and to make arrests for federal felony offenses.

4.      The information contained in this affidavit is based on my own observations, training and experience and information provided to me by other criminal investigators or other law enforcement officers/agents.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      This investigation involves violations of the Controlled Substances Act, to include, conspiracy to possess with intent to distribute and to distribute methamphetamine in violation of 21 U.S.C. § 846; possession of methamphetamine with intent to distribute and distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).

7.     In my training and experience, examining data stored on smartphone devices can uncover, among other things, evidence of who possessed or used the device, who the user was communicating with, and the content of those communications.  Based on my knowledge, experience and training, I believe that the persons who were using the smartphone devices more particularly described in paragraph 8 below are involved in the possession with intent to distribute and distribution of methamphetamine.  This application seeks permission to locate and seize items described in Attachment C.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.     The following devices will be examined (all further described in Attachment B):

     a.  APPLE IPHONE 6; Model: iPhone 6; IMEI: 352017079170815

     b.  ZTE cell phone; MODEL Z558VL; IMEI: 990008940891760

     c.  BLU cell phone; MODEL STUDIO M6; IMEI: 352239090003797

9.     All devices were seized from Josie MILLER and Charles WALLETTE during the execution of a search warrant at 511 South 36th St., Billings, MT 59101 on January 10, 2020.  These three devices will be hereafter referred to as PHONE I (iPhone 6; IMEI: 352017079170815), PHONE II (ZTE cell phone; MODEL Z558VL; IMEI: 990008940891760) and PHONE III (BLU cell phone; MODEL STUDIO M6; IMEI: 352239090003797).

## EXAMINATION OF ELECTRONICAL INFORMATION

10.     The applied-for warrant would authorize the forensic examination of the PHONE I, PHONE II and PHONE III for the purpose of identifying electronically stored data particularly described in Attachment C.

11.     The examination of the devices will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If the United States needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.

12.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders responsive to this search warrant do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

13.     If the examination does not reveal any data falling within the scope of the warrant, the United States will seal any non-responsive information, absent further authorization from the Court.

4

14.     The United States will retain a forensic image of all of the electronic information produced during the examination of the devices to prove the authenticity of evidence to be used at trial, to respond to questions regarding the corruption of data, to establish a chain of custody of data, to refute claims of fabricating, tampering, or destroying data, and to address potential exculpatory evidence claims where, for example, a defendant claims that the United States avoided its obligations by destroying data or returning it to a third party.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

15.     It is not possible to determine, merely by knowing the smartphone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Smartphone devices today can be simple cellular telephones and text message devices, and/or they can include cameras, serve as personal digital assistants and have functions such as calendars and full address books, and/or they can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the devices may only be powered in a secure environment or, if possible, started in "airplane mode," which disables access to the network.  Unlike typical computers, many smartphones do not have

hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some smartphone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive.

16.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, items that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

17.    Based on the foregoing, and consistent with Fed. R. Crim. P. 41(e)(2)(B), I seek permission for an agent review of the devices as well as the forensic examination of the devices consistent with the warrant. The examination will require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

18.     In searching the data stored on the devices, law enforcement personnel executing this search warrant will employ the following procedure:

a.      The team searching the devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized described in Attachment C.

b.      The team may subject all of the data contained in the devices or the forensic copy to the protocols to determine whether the devices and any data falls within the items to be seized described in Attachment C.  The team searching the devices may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized described in Attachment C.

c.      These search protocols also may include the use of tools to exclude normal operating system files and standard third-party software that do not need to be searched.

d.      When searching the devices pursuant to the specific search protocols selected, the team searching the devices shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

e.      If the team searching the devices pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.      At the conclusion of the search of the devices, any one device determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the United States until further order of the Court or one year after the conclusion of the criminal case/investigation.

g.      Notwithstanding, after the completion of the search of the devices, the United States shall not access digital data falling outside the scope of the items to be seized in this warrant on any retained devices or digital data absent further order of Court.

h.      If the search team determines that a device is not an instrumentality of any offense under investigation and does not contain any data falling within the list of items to be seized described in Attachment

C, the United States will as soon as practicable return the device and delete or destroy all the forensic copies thereof.

i.      If the search determines that the device or the forensic copy is not an instrumentality of any offense under investigation but does contain data falling within the list of the items to be seized described in Attachment C, the United States either (i) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the device and forensic copy; or (ii) retain only a copy of the data found to fall within the list of the items to be seized described in Attachment C and return the device and delete or destroy all the forensic copies of the device.

## PROBABLE CAUSE

19.     In June 2019, members of the DEA and ATF Billings offices established a confidential source (CS). The CS has provided credible and reliable information that was either already known to investigators or individually corroborated. The CS has also assisted DEA and ATF with controlled purchases of methamphetamine and firearms.

20.     According to the CS, Josie MILLER distributes large quantities of methamphetamine and stores the methamphetamine at her residence of 511 S 36th St. in Billings, Montana. Josie MILLER also drives a black Dodge Ram truck

bearing Montana license plate 377659C (RO: MILLER, Josie, 511 S. 36th St.,

Billings, MT) and a white Acura TL bearing Montana license plate ALI (RO:

MILLER, Josie, 511 S. 36th St., Billings, MT), both of which law enforcement has

observed parked at Josie MILLER's residence on multiple occasions.

21.     Robert MILLER is Josie MILLER's son.  The CS stated that Robert

MILLER picks up methamphetamine from Josie MILLER and transports the

drugs in his vehicle to Bozeman, Montana for distribution.  The CS stated that

Robert MILLER makes trips on a weekly basis with illegal narcotics.  On

approximately July 20, 2019, the CS told investigators that Robert MILLER

recently packed a tire of his vehicle full of illegal narcotics, which came from

Josie MILLER, and transported the drugs to Bozeman.  Investigators have

observed Robert MILLER's vehicle parked at Josie MILLER's residence on

multiple occasions.

22.     The CS stated that Charles WALLETTE is Josie MILLER's

boyfriend and WALLETTE is also involved in the distribution of Josie MILLER's

illegal narcotics.  Your Affiant has seen WALLETTE's silver Pontiac Firebird

bearing Montana license plate RIPNBRD (RO: WALLETTE, Charles Allen, 511

S. 36th St., Billings, MT) at MILLER's residence regularly, and according to the

CS, WALLETTE is MILLER's live-in boyfriend.  In June 2019, Charles

WALLETTE told the CS that he traded two ounces of methamphetamine for the

silver Pontiac Firebird.  The CS has witnessed Charles WALLETTE assisting

Josie MILLER with handling large quantities of suspected methamphetamine at

Josie MILLER's residence.

23.     According to the CS, Charles WALLETTE distributes Josie

MILLER's methamphetamine to multiple people while driving either his Pontiac

Firebird or Josie MILLER's Dodge Ram.  The CS stated that Charles

WALLETTE distributed approximately a quarter pound of methamphetamine on

July 8, 2019, to a male called "Mechanic Mike".  On July 15, 2019, the CS told

investigators that Charles WALLETTE travels to the gas station by Riverstone

Health in Billings where he delivers about three to four ounces of

methamphetamine to an unknown individual.  The CS also disclosed that Charles

WALLETTE delivers ounces of methamphetamine once a week in his Pontiac

Firebird to an unknown male at the Lucky Cuss casino in Billings.

24.     Investigators have observed Charles WALLETTE at Josie

MILLER's residence on numerous occasions.  Investigators have also observed

Charles WALLETTE driving the Firebird and Josie MILLER's black Dodge Ram.

25.     On June 24, 2019, the CS assisted ATF investigators in conducting a

controlled purchase of methamphetamine and a firearm from Josie MILLER.

During the operation, the CS was provided $1000 of US currency and equipped

with a transmitting and recording device.  At approximately 12:35 PM, the CS

11

arrived at Josie MILLER's residence located at 511 S 36th St and went inside. The CS purchased approximately 18 grams of methamphetamine from Josie MILLER for $900. Josie MILLER showed the CS a black pistol, but the deal for the firearm was interrupted when someone walked into the back door of Josie MILLER's residence. The CS left Josie MILLER's residence and met up with ATF investigators who retrieved the purchased methamphetamine, remaining $100, and recording device.

26.     On June 27, 2019, the CS assisted ATF investigators in conducting another controlled purchase of methamphetamine and firearms from Josie MILLER. According to the CS, Josie MILLER wanted to sell a stolen firearm for $100, one ounce of methamphetamine for $900, and a revolver for $350. During the operation, the CS was provided $1400 of US currency and equipped with a transmitting and recording device. At approximately 3:05 PM, the CS arrived at 511 S. 36th St., Josie MILLER's residence, and went inside. The CS purchased approximately 25 grams of methamphetamine from Josie MILLER for $950. Josie MILLER and Katarina MEZA were both present with the CS, and they were discussing larger amounts of methamphetamine for the CS to purchase. Josie MILLER failed to sell any firearms during this operation. The CS left Josie MILLER's residence and met up with ATF investigators who retrieved the purchased methamphetamine, remaining $450, and recording device. The CS

stated that Josie MILLER would sell a quarter pound of methamphetamine for $3000.

27.    At approximately 5:00 PM, the CS met with ATF investigators. The CS was provided with $3050 of US currency and equipped with a transmitting and recording device. At approximately 5:15 PM, the CS arrived at 511 S. 36th St. and went inside. The CS purchased approximately a quarter pound of methamphetamine from Josie MILLER and Katarina MEZA. While inside Josie MILLER's residence, an unknown male asked the CS what type of firearms were desired. The unknown male also stated he could have firearms delivered in one hour. The CS left Josie MILLER's residence and met up with ATF investigators who retrieved the purchased methamphetamine and recording device. The CS disclosed that while inside Josie MILLER's residence, Robert MILLER, Charles WALLETTE, Josie MILLER, Katarina MEZA, and other unknown individuals were present. The CS also observed Josie MILLER walk into the laundry room, reach straight up towards the ceiling, return with a garbage bag full of methamphetamine, and weigh each ounce of methamphetamine on a scale in the kitchen. ATF Special Agent (SA) Kirby Fanus confirmed the methamphetamine with a positive field test.

28.    On July 2, 2019, the CS assisted DEA and ATF investigators in conducting another controlled purchase of methamphetamine and a firearm from

13

Josie MILLER.  According to the CS, Josie MILLER wanted to sell one pound of methamphetamine for $4100 and two guns for $500.  During the operation, the CS was provided $4800 of US currency and equipped with a transmitting and recording device.  At approximately 1:08 PM, the CS arrived at 511 S. 36th St. and went inside.  The CS purchased approximately six ounces of methamphetamine and a HiPoint model C9 9mm pistol from Josie MILLER for $4600.  The CS left Josie MILLER's residence and met up with ATF and DEA investigators who retrieved the purchased methamphetamine, purchased firearm, remaining $200, and recording device.  According to the CS, Josie MILLER, Katarina MEZA, Erin GALLOGLY, and Charles WALLETTE were all present during the deal.  The CS observed Josie MILLER store the methamphetamine in a large drawer and used a scoop to measure out the methamphetamine prior to selling it to the CS.

29.     On August 16, 2019, the CS assisted DEA and ATF investigators in conducting another controlled purchase of methamphetamine from Josie MILLER and Charles WALLETTE.  The CS had met with MILLER and WALLETTE at approximately 11:00 a.m., earlier that day, and determined MILLER and WALLETTE were in possession of at least 2 ounces of methamphetamine for the CS to purchase.  The CS spoke with MILLER and WALLETTE, at MILLER's residence, whom both stated they would have the methamphetamine and it would

cost $900 per ounce, but the CS would have to come back after 2:00 p.m. The CS informed ATF and DEA agents about the timeframe.

30.    At approximately 2:37 p.m., the CS returned to 511 S. 36th St, and encountered WALLETTE outside the back door of the residence. WALLETTE informed the CS MILLER was inside waiting and had the methamphetamine. The CS purchased around 44 grams of methamphetamine from Josie MILLER for $1800. The CS left Josie MILLER's residence and met up with DEA investigators who retrieved the purchased methamphetamine and recording device. According to the CS, upon leaving the residence, WALLETTE asked the CS to come look at what he had outside near the garage. When the CS walked over to him, WALLETTE showed the CS two large clear plastic baggies containing what appeared to be pound quantities of methamphetamine. WALLETTE called the baggies "batteries" and said he could deliver the batteries whenever. The CS drove away and met with DEA and ATF investigators and provided them with the methamphetamine and recording device.

31.    On September 20, 2019, your Affiant was contacted by Billings PD Street Crimes Unit (SCU) Officer Foster. Officer Foster informed your Affiant he had seen MILLER's Black Dodge Ram at Star REXFORD's residence located on Joyce Circle in Billings, MT. Per law enforcement records, REXFORD has previous arrests for Criminal Possession of Dangerous Drugs (F) and currently has

an active warrant for Criminal Possession of Drug Paraphernalia (M).

Additionally, Officer Foster stated he was told from a Source of Information

(SOI) that Doyle Eugene MASON, an individual known to law enforcement to

sell drugs, was being supplied methamphetamine from Josie MILLER in the past.

32.    Law enforcement records checks reveal MASON has numerous prior

arrests for drugs.  Officer Foster stated he had personally seen MILLER's vehicle

while conducting surveillance on at least two different locations suspected of

selling drugs.  Officer Foster did not believe a female was driving the vehicle.

Your Affiant knows based on surveillance of MILLER's residence that

MILLER's boyfriend, Chuck WALLETTE, regularly utilizes MILLER's vehicles

to conduct deliveries of drugs to known lower level drug traffickers in the greater

Billings area, and based on CS information, has used MILLER's Dodge Ram to

drive to locations outside Billings to pick up methamphetamine.  Additionally, per

CS information, WALLETTE will regularly travel with a firearm for protection

during these deliveries.

33.    On October 15, 2019, the CS assisted DEA and ATF investigators in

attempting to conduct a controlled purchase of methamphetamine from Katerina

MEZA.  Per the CS, MEZA had previously stated she would sell the CS

methamphetamine for $900.00.  According to the CS, Miller had stopped by the

CS's home and informed the CS that MEZA was busy, but would come by later

16

that day with the methamphetamine.  DEA and ATF set up surveillance at the CS's home and at MILLER residence.  At approximately 4:30 p.m., the CS received a call from MEZA stating she would stop by the CS's house.  At approximately 4:36 p.m., surveillance observed MILLER's 2008 white Acura TL depart from 511 S. 36th St.  At approximately 4:53 p.m., MILLER's Acura arrived at the CS's residence.  Your Affiant observed MILLER and another female, later identified as Renee RODRIGUEZ, exited the Acura and go inside the CS's residence.  MILLER provided the CS with approximately 27 grams of methamphetamine for $900.00.  MILLER and RODRIGUEZ departed the CS's residence and drove directly back to 511 S. 36th St. as followed by surveillance.  ATF agents retrieved the purchased methamphetamine and recording device from the CS.

34.    On November 7, 2019, the CS contacted ATF Special Agent Kirby Fanus regarding Jonathon COOPER (DOB: 09-04-1986). The CS said COOPER would sell an ounce of methamphetamine for $950.00 and would only deal ounces of methamphetamine.  On November 14, 2019 at approximately 1230 hours, the CS travelled to The Living Canvas Tattoo Studio located at 928 Broadwater Ave Suite E, Billings, Montana 59102 and met COOPER aka Twitch. COOPER stated that he was busy with appointments, but could sell the methamphetamine later that day or the following day. COOPER told CS that he would call in about one hour.

When leaving COOPER's tattoo shop, the CS saw a small yellow four door pickup truck with a roof rack. The driver was Julie BALBACK (DOB: 03-13-1960). BALBACK asked the CS if the CS was dealing with her people, referring to COOPER.

35.    On November 14, 2019, at approximately 3:00 p.m., COOPER called CS and informed the CS to go to the Reno Club located at 150 Calhoun Lane, Billings, MT.  COOPER said he would send someone with the methamphetamine. The CS was provided with $1,000.00 of ATF agent cashier funds for the purchase of an ounce of methamphetamine.  The CS was provided a recording device to wear for the transaction.  At approximately 3:15 p.m., the CS travelled to the Reno Club located at 150 Calhoun Lane, Billings, MT 59101. The CS placed a call to COOPER; COOPER said the methamphetamine was on the way, and that the CS would know the female making the delivery.

36.    At approximately 3:30 p.m., COOPER drove by the Reno Club in a green Dodge Ram 1500 pickup bearing MT temporary tag AAS6537.  At approximately 3:48 p.m., the CS received a telephone call from 406-541-8481. The caller was described as a female with a muffled voice that stated to the CS, "she will be there soon".  At approximately 3:50 p.m., a small yellow four-door pickup truck with a roof rack driven by BALBACK appeared at the Reno Club. An unknown female got out of the passenger seat of the yellow pickup truck, got

18

into the driver seat, and drove the small yellow pickup truck away. Julie
BALBACK met with the CS, and asked for the money for the methamphetamine.
The CS would not provide the money without seeing the illegal narcotics.
BALBACK made a call to an unknown individual and asked for the
methamphetamine to be delivered to the Reno Club. At approximately 3:59 p.m.,
Josie MILLER arrived in her white Acura TL bearing Montana license plate ALI.
The CS provided $1,000 to BALBACK and retrieved approximately one ounce of
methamphetamine from MILLER. SA Fanus and TFO Feuerstein met the CS at
an undisclosed location and retrieved the recorder and suspected
methamphetamine. A debrief was then conducted with the CS. The CS stated that
MILLER had two extra baggies of suspected methamphetamine hanging out of
her bra. The CS stated each bag of suspected methamphetamine was
approximately one ounce.

37.    On December 5, 2019, ATF SA Joe Korth, ATF SA Andrew Martin
and your Affiant debriefed the CS. During the debrief, the CS stated that shortly
before Thanksgiving, MILLER had informed the CS she was sitting on a large
amount of methamphetamine and would sell this to the CS for $5000.00.
Additionally, the CS stated approximately 1 month earlier, WALLETTE had
dropped by the CS house and had shown the CS 10 plastic bags (believed to be 1
gallon) filled with methamphetamine.

38.     On January 2, 2019, ATF SA Kirby Fanus was conducting surveillance on 511 S. 36th Street, Billings, MT.  SA Fanus observed Charles WALLETTE walk to a silver 2006 silver Pontiac Firebird bearing Montana license plate "RIPNBRD" that was parked in the alley behind the residence, and leave 511 S. 36th Street, Billings, MT. SA Fanus then conducted surveillance on WALLETTE as he drove to 4th Avenue North, Billings, MT. WALLETTE parked on North 24th Street, Billings, Montana for approximately 15 minutes. SA Fanus then followed WALLETTE to the gas station located at 2620 Sixth Avenue North, Billings, MT. SA Fanus maintained a visual on WALLETTE until a Billings Police Department K9 could make a traffic stop on WALLETTE for failing to use his turn signal. WALLETTE was the only occupant in the vehicle. SA Fanus did not see WALLETTE meet with anyone. Billings Police Department (BPD) Officer Nathan Contreraz stated he could smell marijuana while approaching the vehicle. Officer Contreraz asked for consent to search the Firebird. WALLETTE provided verbal and written consent.  BPD Officer found approximately 15 grams of suspected methamphetamine, marijuana, a scale, clear plastic baggies, suspected methamphetamine pipe, and other drug paraphernalia found in a small black case under the front passenger seat.

39.     BPD Officer Contreraz concluded the search at this point, pending a state search warrant. A tow truck was called, and SA Fanus followed the tow truck

and silver Pontiac to BPD impound. BPD Officer Jeremiah Adams arrived and

sealed the vehicle with red tape. SA Fanus retrieved the following evidence from

BPD Officer Nathan Contreraz that was found during the consent search: small

black nylon bag pipes, paraphernalia, suspected marijuana, and small plastic pill

shaped containing; a small dream gear black case (sunglasses container sized

pouch) that contained approximately 15 grams of suspected marijuana, scale,

plastic baggies, and approximately 15 grams of suspected methamphetamine. On

Friday, January 3, 2019, ATF Task Force Officer (TFO) Steve Feuerstein applied

for and was granted a state search warrant for silver 2006 silver Pontiac Firebird

with Montana license plate RIPNBRD.

40.    On January 10, 2020, at approximately 6:00 AM, members of the

Drug Enforcement Administration (DEA) Billings Resident Office (BRO), Bureau

of Alcohol, Tobacco and Firearms (ATF), Montana Division of Criminal

Investigation (MDCI) and Billings Police Department (BPD) executed a Federal

Search Warrant at 511 South 36th Street, Billings, MT.  Josie MILLER and

Charles WALLETTE are known to reside at 511 South 36th Street, Billings, MT.

41.    During the course of the search, agents/officers located

approximately 1509.4 grams of methamphetamine, 4541.9 grams of marijuana,

multiple diverted pharmaceuticals, hallucinogenic mushrooms, heroin and

$64,074.00 in U.S. currency that was individually banded in $1000 increments

(which is common for drug traffickers to keep a running total of proceeds). Additionally, PHONE I and PHONE II were located in the master bedroom of MILLER and WALLETTE and PHONE III was located in the downstairs living room area. All three phones were found in the vicinity of methamphetamine. Once at the BRO, TFO Grant Morrison conducted a presumptive field test of the methamphetamine with positive results. All drug exhibits have been sent to the DEA Western Regional Lab for further analysis.

43.    In my training and experience, examining data stored on cellular phones of the type of PHONE I, II, and III can uncover, among other things, evidence of crimes committed by the user(s) and reveal or suggest who possessed or used the devices. PHONE I, II, and III were all found in close proximity to large amounts of methamphetamine as well paraphernalia consistent with trafficking. In my training and experience, drug traffickers use cellular phones to engage in setting up and negotiating drug transactions. They utilize social media and text applications to set up meet locations, coordinate shipments from sources of supply, and keep a log of pay/owe balances with customers. During the course of the execution of the search warrant, your Affiant learned that only MILLER and WALLETTE resided in the residence in which the phones were located.

44.    Shortly following the execution of the search warrant, SA Fanus, Resident Agent in Charge (RAC) Joseph Korth, SA's Christopher Cavanaugh and

Jeremy Crowther transported MILLER and WALLETTE to the DEA office for

additional questioning.  MILLER was read her Miranda Warnings and agreed to

talk to SA Cavanaugh, SA Fanus and DEA Intelligence Analyst Fred Morck and

informed them the methamphetamine located in her residence had been provided

to her from an individual known only as "Eddie".  She stated Eddie was a

Hispanic male who would drive to Montana from Arizona and would deliver

approximately 4 pounds of methamphetamine to her.  She stated she and

WALLETTE met Eddie through a local acquaintance of WALLETTE's.

MILLER said she and WALLETTE met Eddie early during the previous summer

(approximately June 2019).  She said she had received methamphetamine 3 to 4

times from Eddie since June and he would charge her $6000.00 per pound for the

drugs.  MILLER said she would sell the methamphetamine to multiple local

individuals, more specifically Brian ELLIS, Jeff MAPEL, and her niece Katerina

MEZA.  All of these individuals are known to local law enforcement as drug

traffickers who sell ounce quantities of methamphetamine.  MILLER utilized

PHONE I to point out numbers for Eddie and other individuals involved with drug

trafficking which were contained in the contacts section of her telephone.

## CONCLUSION

45.    Based upon the foregoing information, I request that the Court issue

the proposed search warrant.

23

DATED this _28_ day of January, 2020.

_____
Christopher Cavanaugh, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on the _28_, January, 2020.

_____
Timothy J. Cavan
UNITED STATES MAGISTRATE